The last argument will be in Case No. 23-7572, Russell v. Westchester Community College Avram Turkel-Bell installed PC for Plaintiff Appellant Dr. Susan Russell, may it please the Court. We ask the Court to reverse the District Court's grant of summary judgment to defendant respondent. District Court erred, finding no disability or perceived disability by the Plaintiff Appellant. There is no genuine disagreement that Dr. Russell suffered from pulmonic stenosis at childhood. The defendant respondent's expert report admits as such that is at the confidential appendix at 64. The defendant's expert report does not remove all issues of fact, but merely surmises that the pulmonic stenosis, I'm mispronouncing that I understand, result on its own. There's also no genuine issue of fact that The treatment records from the cardiologist also show that he encouraged her to exercise and that she reported going to the gym, jogging, walking, and playing tennis, and that she was teaching in her classes when she first told the college that she was in the hospital. She said she'd only miss a day or two. So the idea that she was restricted in her major life activities, I mean, that she was bedridden and unable to do anything, I mean, isn't that just contradicted by the record? No, Judge, and you'll see in the record Dr. Russell's continuous, well, I shouldn't say Dr. Russell's continuous, many doctor's reports, et cetera, and Dr. Russell's testimony about her inability to fully perform during the period after what she thought was her heart attack. But it is sort of less the point than the perceived- So to what extent was she unable to perform? Well, she said she was tired and unable to get around, et cetera, and some of the doctor's reports say she's planning to exercise and things of that nature. But her testimony is that she was not able to perform in the way she was prior to the medical event. Again, second, that is almost secondary to the, it is secondary to the perceived disability. Now, we asked the court to go back to this May 2nd email from Delacorte, and district court based its decision largely around this finding that the May 2nd email from Dr. Delacorte, which was sent to, within the administration, was merely an expression of concern regarding plaintiff and plaintiff's behavior. The language of that May 2nd email, though, says, and I'll quote to you, you wrote in your email that you were offended by Dr. Osmond's phone call, yet you admit more than once that you have been, quote, grouchy due to your health and your communication. And then later, if this is how you are handling situations in your class, please consider reflecting on your communication style and whether or not your health may be interfering with your teaching. That is not an admission of his understanding. He's just taking what she's told him about her health. Your Honor, we submit to the court that a reasonable juror, that there is an issue of fact concerning that, that a plain reading of that statement is that the defendant-respondent knew of the condition and knew that it was a problem and are telling, or mean to tell anyway, because this wasn't sent to Dr. Russell, mean to tell Dr. Russell, you admit that your condition is a problem and is causing you to be grouchy. And that grouchy language then comes back later during the termination. Now, it's hard to say. I mean, even if the college, I'm not sure that this evidence shows that, but even if the college thought that her insubordination or her behavior stemmed in part from a disability, you're still allowed to fire somebody for insubordination even if it's related to a disability, right, as long as the target is not the disability, right? So isn't it sort of irrelevant as to whether the conduct to which they objected was related to disability? The question is whether the conduct was the genuine reason for the firing as opposed to the disability itself. We're at the genuine reason, but reason it would be. But we have shown for the purposes of summary judgment a genuine issue of fact concerning pretext. Judge, this e-mail, I mean, this e-mail itself says, you know, you're saying you're grouchy and in a bad mood because of your health concerns, but you should think about whether this is the way to react to your health concerns. We don't think that your health concerns require you to behave in this hostile way to your colleagues and students. We submit to the court that a trier of fact could read it differently, and that is what Your Honor is saying. Is this the way you think it should be read? That the college knows of the condition and is telling Dr. Russell, you admit that the condition is the cause of this behavior. You've asked the college— But even the way that you're talking about it, it sounds like the real reason for the firing is the behavior. No, because— And not the condition. I mean, it's not like they're saying we really hate people with heart conditions and don't want them to be part of our college. They're saying, you know, you're acting in an unacceptable fashion. Dr. Russell asked for accommodation. That is in district court's ruling. The college then gives—it's a little hard to pin down. District court says that the college fired Dr. Russell because of insubordination. The testimony and the evidence is a little hard to pin down what the college actually was firing Dr. Russell about. Was it— So you're arguing that there's evidence that that was pretext? Yes, Your Honor. Okay. Yes. And that email that we've been talking about? That email is evidence of pretext upon which a reasonable juror could—is evidence a reasonable juror could find that that shows pretext. Yes, Judge. For purpose of summary, yes. But you had to point to evidence that shows they didn't really care about the behavior? They were really focused on the disability? Yes. But this email, even the one that you're quoting, is all about her behavior. It says that maybe the health condition is lurking in the background, but it doesn't say we don't care about your behavior. It says really, you really need to change your behavior. They're saying this email says that the behavior is based on the medical condition. Dr. Russell asked for accommodation. District court found that. Plaintiff need only establish that the defendant regarded her as having a mental or physical impairment. I mean, does a health—does a heart condition require somebody to be insupported and threaten lawsuits and yell at students? If the accommodation is not being provided, it may. It may. The pretext— The heart condition requires you to, like, scream at the employer and threaten to sue them? Well, there is a dispute as to whether or not there was screaming at the employer. Dr. Russell says, I didn't. The college says, she did. That is an issue of fact, not properly resolved in summary judgment. So Dr. Russell asked for the accommodation. It wasn't provided. She was not happy about it. The record shows that. She was entitled to it. That's protected speech. And the college retaliated against her. between the complaints and the termination is sufficient to get there on summary judgment. Now, after the fact, you see in the depositions that Dr. Rossman, higher up in the administration, did perceive plaintiff as, quote, crazy, bonkers, having mental illness, et cetera. She did perceive that plaintiff was suffering from serious health problems at the time. Now, district court said, well, that's all looking at hindsight. A jury could find other ones. I'm sorry. So you're saying the perceived condition is not the heart condition but a perceived mental illness? Doctor, the college knew about the condition. The heart condition. The heart condition. And you see that. So what's the probative value of the bonkers thing? Because they didn't take it seriously. Right? So by May 2nd, one, May 2nd, Dr. Rossman. Can somebody with a heart condition also be bonkers? Could they both exist at the same time? Surely, Your Honor. Right. So it's possible for somebody with a heart condition to act in an insubordinate and unprofessional fashion, right? It surely is. Okay. So the question is whether that's the real reason why the college fired her, right? Yes, Your Honor. So just because she has a heart condition doesn't mean she's immune from firing. That is true. And so all of the we have all of these e-mails from the defendants talking about how they found her behavior unacceptable. And you're saying the reason why we should include that all of that is protectable is because of the May 2nd e-mail saying you say that you've been grouchy due to your health. It's not the only reason, Judge. What's the other evidence? Well, the other evidence is the differing reasons for her termination. District Court finds that it's purely insubordination. But the record shows that Dr. Delcourt, at least, did not think that she had a proper communication with a student who Dr. Russell said was plagiarizing work in a paper. Dr. Osman later said that that was fair. That is to say that Dr. Russell's e-mail to the student telling her that she was failing the student because of the plagiarism was a fair e-mail. So the reasons for the termination have shifted. That's why we have argued that. At one point, they're saying, well, we don't like the way you've talked to the student. At another point, the college is saying, well, you shouldn't have office hours during class time. But then finally they come back and say, no, you were insubordinate. And why were you insubordinate? You were insubordinate in complaining about not getting your accommodation because of the health issue that we know you have, going back to the May 2nd e-mail where the college intends to write to Dr. Russell. You admit you have it. We know you have it. You admit it's causing a problem. Go talk. Go reflect about on your health. Thank you, counsel. Thank you. We'll reserve a few minutes. Good morning, your honors. May it please the court. Sean McCloud for the defendants at police in this case. The real reason why the plaintiff was not invited back to teach as an adjunct during the fall 2014 semester was in no way related to health or retaliation, but it's based on the replete evidence in this record of plaintiffs' insubordinate, unprofessional, and threatening conduct. And that includes e-mails that are on display in the record where she said things like, what the hell is wrong with you, to her supervisors and high-level administrators at the college. If you were smart, you'd stay out of this, referring essentially to her business. Also said things like, I can be a pushy dirtbag. She referred to herself as a despicable person. She continued to lodge threats and aggressive behavior at her supervisor, at her boss's boss, at her boss's boss's boss, who was the dean of academic affairs at the college, until finally, after a couple days of receiving these e-mails, the defendants made a preliminary decision not to invite the plaintiff back as an adjunct during the fall. Unwitting to this preliminary decision, the plaintiff sort of doubled down on her behavior. She continued to send numerous e-mails from early in the morning until late at night. She started accusing Professor Ostman, who was the chair of the English department and her direct supervisor at the time, of having a relationship with a separate defendant in a separate lawsuit in New Jersey that plaintiff was pursuing, which were really unfounded claims. Professor Ostman found these allegations to be bizarre and unfounded and told her that she was being inappropriate. And so based on all of this conduct, which, again, is expressed in her own words in this record to various individuals, on May 8, a collective decision was made not to invite her back. She, again, unwitting to that decision, continued with the conduct. And on May 12, that decision was related to the plaintiff, and she wasn't invited back as an adjunct. So I think your kind of the other side's argument is that that was all pretext, or those were not the real reasons, and the evidence of that is the May 2 email. Could you address that? Yes, Your Honor. So there was a May 2 draft email by Dean Veronica Delcourt, who was the chair of the Arts and Humanities department at the college, in which she references vaguely health issues, but it's only in respect to, as the district court determined, what the plaintiff had told her. The plaintiff said, I'm being, quote, grouchy, end quote, because of health issues. It's clear, a full reading of that email, it's clear that Dean Delcourt was referring instead to what the plaintiff had told her. I'm being grouchy because I'm having these health issues. Well, why is that still appropriate? So if the defendants knew, I mean, the defendants knew about Russell's going to the hospital, and they knew that she said that she had a heart attack, and if she says she was acting irrationally because of her heart attack, why would it be discriminatory to then hold that conduct, which she says resulted from her health issues, against her? So, Your Honor, the May 2nd email doesn't refer to a heart attack. It refers to health issues when the plaintiff- But they know that she said she had a heart attack, right? We know separately that- She did not, I believe, express the word heart attack until later in the correspondence, when she first called Dean Delcourt and said she was going to be out for a day, possibly two, because she was experiencing an irregular heartbeat, which, incidentally, Dean Delcourt also- I mean, does the case really turn on that, whether it was a heart attack or an irregular heartbeat? To the extent that, well, here, no, because- I mean, whatever it was. So the defendants know that she was hospitalized, and they know that she had some kind of heart condition, and she says, I'm behaving in an abnormal fashion because of my heart condition. Doesn't that mean that they should understand the abnormal conduct should be a reflection of disability? Regardless, Your Honor, this court's cases are clear. And decisions such as Bruce Aziz cited in our brief from 2018 and the Sista case from 2006, that even where you have conduct that is directly linked to a plaintiff's disability, that conduct can still be grounds for termination. And here, it was certainly grounds for not inviting the plaintiff back to teach in the fall of 2014. And also, I just wanted to mention, and I don't believe that plaintiff really responds- She had no- independently of the circumstances presented by her claim of disability discrimination, they had no obligation at all to renew her contract. That's right. There were no requirements to renew her contract. Nothing meant that, yeah. That's correct, Your Honor. As it concerns the- But it's okay to do it for a discriminatory reason. That's right. We don't contest that this was an adverse action, although there was no obligation to renew the contract for the fall of 2014. I wanted to mention briefly regarding the regarded as claim. Another reason why she doesn't meet her prima facie case is simply because these conditions that she related to Dean Delcourt were objectively minor and transitory, less than six months. Even in her papers, plaintiff says this was occurring between March of 2014 and May of 2014. So that's less than six months. That's transitory and minor. Objectively, she said to Dean Delcourt, oh, I only need to take a day off. I'll be right back at work. And she was right after- So she does say that, although the New York Human Rights Law says that if you have a diagnosable medical condition that qualifies as a disability, right? She is diagnosed with various heart conditions. I'm not sure the record is actually clear that she ever was, Your Honor. In Dr. Tarkin's report, which can be found in the confidential- Her heart condition? That's correct, Your Honor. So plaintiff- I asked a question. I didn't make a statement. I was just wondering, do we have anything, is there anything in the record independent of her own statements? Oh, I'm sorry, Your Honor. I said, I thought you said that the conditions were based on her own self-reported testimony. So there is her own self-reported testimony. And in her declaration and in her deposition that she suffered from all these ailments. However, if you look at- Let's say hypertension, irregular heart rhythm, frequent PVCs, palpitations, these kinds of things. So a full reading, I think, is useful of Dr. Tarkin's report. That's defendant's expert who reviewed a whole host of these records. It's on the confidential appendix at pages C59 to 83. And he really goes through all of the reports and says, anytime you see any of these diagnoses, you'll see they're actually in a summary of plaintiff's own self-reported history. And, in fact, there is no medical diagnosis of any sort of heart condition that he found. But even regardless, because I do want to stress that we submit that there was no prima facie disability case here. But certainly the reasons here were legitimate and non-discriminatory reasons based on this insubordinate, unprofessional conduct that plaintiff exhibited. I know that the plaintiff mentioned that there was an issue of fact about whether she really yelled at the student. That's sort of a diversion here. What matters is that that instance served as this inflection point, after which plaintiff, on her own, started exhibiting unprofessional conduct in response to a very routine inquiry from her supervisor for a syllabus and to discuss her conferencing practices, whereby she was sending all the students in her class out of the room to only conference one-on-one with other students. She responded with hostility, abusive emails, angry phone calls to numerous people. One phone call to Ruben Verado, the director of counseling, resulted in his feeling so threatened that he reported it to security. And so I want to stress that we don't believe that a prima facie case has been met, but certainly they cannot show pretext here for these reasons. On the retaliation claim, just briefly, again, for the same reasons. There was no pretext. There were these legitimate, non-retaliatory reasons why the plaintiff was not invited back. And we also submit, as stated in our brief, that there are numerous reasons why plaintiff didn't meet her prima facie case. Plaintiff was discussing the request for an accommodation. This isn't a failure to accommodate claim. In order for that to constitute protected activity, she would have had to complain about illicit discrimination in her request for an accommodation. She did not do that textually under the case law. That doesn't count. And neither should her May 7th email, which came after the preliminary decision and which was abusive and hostile, and shouldn't constitute protected activity. And for those reasons and the others stated in our brief, we believe this court should affirm the decision of the district court, granting summary judgment to defendants. Thank you, Counsel. Thank you, Your Honors. We'll hear from her. Counsel discussed the email as a quote-unquote draft email. Well, it was a draft email vis-a-vis Dr. Russell, but this is at page 11 of our brief. On May 2nd at 924 a.m., the plaintiff wrote to Dr. Osmond Madden Werner that she was hospitalized for a heart attack on March 11th, and she apologizes for some behavior on that basis. At 1012, some 48 minutes later, Dr. Delacorte writes this draft email. True, it's a draft vis-a-vis Dr. Russell, but Dr. Delacorte sends it to her superior saying to Joanne Russell within administration, this is an email, I'm planning on sending her, but I'd like your feedback first. Right? Delacorte's superior told her not to do it, don't send that email. And 31 minutes later, just after that, Delacorte emailed Osmond refusing to bring plaintiff back, referencing plaintiff's quote being grouchy as a reason. So it all links up as an issue of fact regarding pretext. The college knew about it. They knew about the condition. They talked about it. Dr. Delacorte was willing to pin it right back on Dr. Russell. You admit that this is the reason, and you admit that your disability is causing you a problem. Go do something about it. And then right after that, they terminate her. Now, Dr. Osmond, in testimony of deposition, says that as of May 2nd, that Dr. Delacorte had decided to terminate Dr. Russell. Then we see a May 8th meeting, and then they decide to terminate Dr. Russell. And, of course, on May 14th, then Dr. Russell actually is informed. So when did it happen? We don't know really. It's an issue of fact. Certainly not something that should have been disposed at summary judgment. As to NYU. If she has a health condition that leads her to behave erratically and unprofessionally, is the college still allowed not to renew her contract because of that unprofessional conduct, or are they required to say, well, she says it's because of the heart condition, and so therefore we can't take an action against her for that reason? They were required to provide her the reasonable accommodation. They were required to talk to her. They had policies. They were required. But we're not talking about an accommodation, right? Like we're talking about whether they were allowed not to renew her contract. Summarily, no. No, they had policies that required them to talk to her, to discuss with her, to figure out what could be done. They didn't follow it. As to NYU, as I heard NYU mentioned, Dr. Russell was an adjunct at NYU. NYU did, in fact, and this is in the record, did, in fact, provide, take the doctor's records and did, in fact, provide the accommodation. As to the doctor. I'm sorry. What's the accommodation you're talking about now? The provider. The class. The office hours. Less out of office hours. Less extra office hours. With regard to the independent medical examination. Would the fewer office hours lead to fewer outbursts and unprofessional conduct and insubordination? That, well, if Dr. Russell says that that's what she needed to accommodate her medical condition, we do not take it as a, we do not accept or admit that she was engaged in any insubordination. She had asked for an accommodation. The college was not abiding by that. And, sure, she got upset about it, but that was not insubordination. I heard it stated earlier that the medical report was conclusive that all of Dr. Russell's, that there was no diagnosis. I believe that was your Honor's question. Well, that's not true. Page 15 of the Dr. Tarkin report admits that Dr. Russell did have pulmonic stenosis since childhood. There's no dispute about that. Well, I didn't know that that was what she was complaining about. I thought she had a heart. She was saying she had a heart attack. She's saying she had a heart attack, but her heart issues in general are, your question, Your Honor, was whether there was any diagnosis. And the answer was, no, it's all self-reported. Right? It's all just because she says so. Well, that's not really true. No, I understand what you're saying. Okay, counsel. Thank you for your argument. Oh, thank you, Your Honor. I'll take the case under advisement. The remaining cases on the calendar, number 22-171 and 24-2162 are on submission, so we'll reserve judgment on those.